# Thomas W. Gough *vs.* Thos. G. Pratt, Admr. of James Kent.

Equity will grant relief, against a judgment at law upon a bond given for a *gambling consideration*, though no such defence was made in the suit at law, and it makes no difference that the judgment was recovered by a *bona fide* assignee for value and without notice.

The statute of 9*th Anne*, *ch.* 14, making *void* all securities given for gambling considerations, is in force in this State: there is nothing in the act of 1813, ch. 84, or any previous law, which either in express terms, or by necessary implication, repeals it.

A legislative interpretation of what was the previous law on the subject, upon which an act of the Legislature may be passed, is not binding upon the courts.

If, when executed, the bond was intended by the obligor, to secure the payment of money won of him by the obligee, who took and held the security for that purpose, it was void *when given*, and a subsequent discovery, by the obligor, that he was the winner instead of loser, will not make it less obnoxious to the laws against gambling.

APPEAL from the Equity Side of the Circuit Court for Saint Mary's county.

The bill in this case was filed by the appellant, for an injunction to restrain execution of a judgment recovered against him on a bond, upon the ground that the consideration of the bond was money won in betting and gambling at cards. The allegations of the bill, and the facts of the case, are fully stated in the opinion of this court. The appeal was taken from the order of the court below, (CRAIN, J.,) sustaining the demurrer of the appellee, dissolving the injunction, and dismissing the bill.

The cause was argued before LE GRAND, C. J., ECCLESTON and TUCK, J.

*John M. S. Causin* for the appellant, argued:

That the general rule, that where there is a complete remedy at law, equity cannot be resorted, is not universal and inflexible, but liable to various exceptions, among which are individual contracts and engagements in violation of public policy and morals, such as usury, gambling, &c. In such cases equity will interfere, even though there has been a recovery in an action at law in which the defence was not made. 3 *H. & J.*, 568, *West vs. Beanes.* 4 *Barn & Ald.*, 92, *Roberts vs. Goff.* 6 *Md. Rep.*, 218, *Hitch vs. Fenby.* 2 *Story's Eq.*, sec. 885. *Eden on Injunctions*, 21, 35, 36, 38, 69. *Ambler*, 269, *Rawden vs. Shadwell.* 2 *Freeman*, 223, *Humfryes vs. Rigby.* 2 *Hen. & Munf.*, 80, *Woodson & Royster, vs. Barrett & Co.* 3 *Randolph*, 215, *Skipwith vs. Strother.* 4 *Monroe*, 299, *Gill vs. Webb's Adm'r*, and the same case in 2

*Monroe;* 4: The opinion of Chief Justice Taney, in the case of *Lloyd vs. Watson,* upon the very point raised in this case, is conclusive of the question. The preceding authorities show that it makes no difference that the bond has been assigned for value, and that the assignee, without notice of the illegality of the transaction, has recovered the judgment at law. Such a contract is made *void* by the statute of 9*th Anne, ch.* 14, *sec.* 1, which is applicable to this State, (3 *H. & McH.,* 348, *Hook vs. Boteter; Kilty's Reports of Statutes,* 248,) and has never been repealed by any act of Assembly. The demurrer confesses the allegations of the bill, that the only consideration for the bond, on which this judgment was recovered, was for money won in betting and gambling at cards. The bond, therefore, was made *void* by the statute, and there can be no recovery upon it, no matter into whose hands it may come. It is, in this respect, like a forged note, or the contract of an infant, or a *feme covert.* It is supposed, by the counsel for the appellee, that the act of 1813, ch. 84, has repealed the statute of 9*th Anne.* But this is not, in my opinion, the effect of that law. It applies to *money* won at gaming, but has no application to *securities* given for *gaming debts.* In this view, instead of repealing, it comes *in aid* of the statute.

*Thos. G. Pratt* for the appellee, argued:

That the appellant had a full opportunity of defending himself at law, and that a court of chancery will not grant relief in such a case, it not being pretended or charged in the bill that he was prevented from defending himself at law by fraud, accident, or inability to establish the fact set up in his present defence. 11 *G. & J.,* 110, *Prather vs. Prather.*

The bill alleges, that the complainant was not the loser, but was the winner, at the game; and the demurrer *admitting this,* the consideration was not a *gambling debt,* and the bond was simply a *nudum pactum.* In such a case, after a recovery at law, there clearly can be no relief in equity. But suppose this objection be untenable, how stands the case? The intestate of the appellee is an *assignee for value* of this bond, without notice of the alleged defect in its consideration. He is,

therefore, an *innocent party*, and if there was any fraud in the transaction, the *appellant* was a participator, and of that fraud *he* now seeks to take advantage. The question, whether relief in such a case can be granted by a court of equity; is a new one in this State;—it has never before been decided by our courts. The act of 1813, ch. 84, declares; that "no sum or sums of money, or any thing whatever; won or lost, or pretended to be won or lost by any species of gaming or betting whatsoever, shall be *demandable or recoverable*" before any court, or by any legal process: "*Provided* that this law, or any thing herein contained, shall not be construed to extend *to any suit or action now pending in any court* in the State of Maryland." This proviso clearly shows, that *prior* to the passage of this act, money won at gaming could be recovered in this State by an action at law; and that gaming contracts were *not void;* because it exempts *pending actions* from its operation. The statute of *9th Anne,* therefore, could not, in the opinion of the Legislature, have been in force in this State. At common law bets were recoverable, and it requires some act of Parliament or of the Legislature; to prevent their recovery. 4 *H. & McH.*, 286, *Wroth vs. Johnson.* We must then look to and apply the act of 1813 to this case. That act does not *avoid the contract;* but simply prevents a recovery upon it in a court of justice. This is the extent of that law— it is that no such debts shall be "*demandable or recoverable.*" But, in this case, we have already recovered our judgment without objection on the part of the appellant. Can he now resort to the statute to defeat this judgment? 'The statute of frauds says, there shall be no *recovery* upon certain contracts, unless they are in writing, but does not make them *void.* But when a contract is *executed,* the defendant may rely upon its execution as an answer to the statute. This is the distinction that runs through all the cases. You cannot recover upon such a contract, if the objection is made, but when there is a recovery, or when the contract is *executed,* a party may always *defend* under it. 4 *Md. Rep.;* 316, *Crane vs. Gough.* In all the cases cited on the other side, the contract was made *void* by statute. The case of *West vs. Beanes,* was under

67     v.9

the usury law of 1704, which makes usurious bonds and con-
tracts *void.* In the opinion of Chief Justice Taney, relied
upon by the other side, no distinction is made between the
usury act, which *avoids* the contract, and the act of 1813,
which only says, no sum of money won at gaming shall be
"*demandable or recoverable.*" It seems to me impossible to
read this act and say that such contracts are *void.*

ECCLESTON, J., delivered the opinion of this court.

The bill in this case, filed the 5th August 1852, alleges, that
on the 29th of May 1849, the complainant executed a single
bill to Augustus R. Sollers, on which suit was instituted in his
name for the use of James Kent, and on the 7th of August
1850, judgment by default was entered against the complain-
ant upon the said single bill; the only consideration of which
is money Sollers claims or pretends to have won in "betting
and gambling at cards" with the complainant.

The bill also states, that a *fieri facias* had been issued upon
the judgment; and after calling on the defendants, Sollers and
Kent, to answer generally, but especially as to the considera-
tion of the single bill, it prays for an injunction to stay all fur-
ther proceedings on the judgment and execution, and for such
other relief as the case may require.

The single bill is for $869, on the back of which is an as-
signment from the obligee to James Kent.

An injunction and subpœnas were issued. Sollers was re-
turned summoned, but never appeared. Kent was returned
"*Mortuus est.*" After which the present appellee, as admin-
istrator of Kent, appeared and demurred to the bill, assigning
the following causes of demurrer.

"First, that the said complainant hath not, in and by his
bill, stated such a case as doth or ought to entitle him to any
such discovery or relief, as is thereby sought and prayed for,
from or against this defendant.

"Second, that if the matters stated do give the complainant
any cause of complaint against this defendant, the same is
triable and determinable at law, and ought not to be inquired
of by this court."

'The cause being submitted upon bill, demurrer and exhibits, a decree was passed, on the 28th of May 1855, dissolving the injunction and dismissing the bill. The question, whether that decree is correct or not, we are now called on to decide, upon an appeal taken by the complainant.

The appellee insists upon his right to an affirmance of the decree, because, conceding the single bill was given for a gambling consideration, if that rendered the claim nugatory and void, it might have been used as a defence to prevent the judgment at law; and failing to do so, the complainant is not entitled to relief in a court of equity.

In *Thomas, Trustee of Lloyd, vs. Watson,* decided in the Circuit Court of the United States, for the Maryland District, Lloyd, it seems, had confessed a judgment in favor of Watson, upon two promissory notes given by the former to the latter. Lloyd became insolvent, and Thomas was appointed his trus-tee. An execution having been issued on the judgment, and levied, the trustee filed a bill, alleging that one of the notes was given for an *usurious* and the other upon a *gambling* consideration, offering to pay the amount actually lent by Watson to Lloyd, with legal interest thereon, and praying to be relieved from the residue of the judgment. The bill called on the defendant to state the consideration for which the notes were given. The defendant demurred to this interrogatory, assigning for cause of demurrer, that the consideration of the notes was triable and determinable in the suit at law, and ought not, therefore, to be inquired into in a court of equity. The complainant excepted to the answer as insufficient, insist-ing that the defendant was bound to answer the interrogatory; and the cause was heard upon the exceptions, and upon a motion to continue the injunction, which had been issued. After argument, the complainant's exceptions were allowed, the defendant's answer was adjudged insufficient, and the in-junction continued until the further order of the court.

The opinion of the court, in that case, was delivered by Chief Justice Taney, who has examined the subject with his usual ability, as may be seen in the note below—a manu-script copy of which opinion was used in the argument of this case.

The principle there decided is directly in opposition to the ground here taken by the appellee. And concurring with the decision in that case—so far, at all events, as relates to the note for a gambling consideration—we refer to the opinion there delivered, for reasons why the present appellant is not excluded from relief in equity, on the ground that the single bill was given for a gambling claim, notwithstanding he neglected to resist the suit at law upon that ground, even should it be conceded he might have done so successfully. See, also, *Woodson & Royster, vs. Barrett & Co.*, 2 *Hen. & Munf.*, 80; and *Skipwith vs. Strother, et al.*, 3 *Rand. Rep.*, 214.

It has been said, by the appellee, the Circuit Court of the United States, in the case referred to, were wrong in holding a security given for a gambling debt to be void in this State. He contends the decision was based upon the idea that the statute of 9*th Anne, ch.* 14, was then in force here, when, in fact, it was not. The act of 1813, ch. 84, he says, does not make *void* such securities as the present, but simply provides, they shall not be "demandable or recoverable before any court of justice;" and not being absolutely *void*, but only *voidable*, if resisted in proper time, a court of equity, after a judgment at law, could not prevent the claimant from demanding payment. The proviso of that law, declaring the act should not be construed to extend to any suit or action at law then pending, the appellee says, is a legislative construction, that the statute of 9*th Anne* was not then in force in Maryland, and that prior to the passage of the act, a suit might be maintained upon a gambling security or claim.

But we see nothing in this, or any previous law, which, either in express terms or by necessary implication, repeals the statute of *Anne*. Should it be conceded the laws relate to the same matters, they are not so inconsistent as to require that the statute should be considered as repealed by our legislation. And in reference to whether a suit could or could not be maintained upon a security given for a gambling consideration prior to the act of 1813, if the proviso of that act has any relation to such securities, it can only be regarded as a legislative interpretation of what was the previous law on the subject; which

interpretation is not binding upon us, unless we think it cor-
rect, which we certainly do not.

In *Hook vs. Boteter*, 3 *H. & McH.*, 348, the statute of 9*th
Anne, ch.* 14, was recognised as being in force in Maryland.
It is also to be found in *Kilty's Rep. of Statutes*, under the
head of "STATUTES FOUND APPLICABLE AND PROPER TO BE
INCORPORATED." This report of Mr. Kilty's, the Court of
Appeals have said, "was compiled, printed and distributed,
under the sanction of the State, for the use of its officers, and
is a safe guide in exploring an otherwise very dubious path."
*Dashiell vs. Attorney General*, 5 *H. & J.*, 403.

These authorities show, that the statute of *Anne* has been
considered as included among the English statutes which have
been adopted in Maryland. The first section of which pro-
vides, that "all notes, bills, bonds, judgments, mortgages, or
other securities or conveyances whatsoever," given for a gam-
bling consideration, in whole or in part, "shall be utterly void,
frustrate and of none effect."

The statute of 16 *Charles 2nd, ch.* 7, which is, "An act
against deceitful, disorderly and excessive gaming," Mr. Kilty
also informs us is in force in this State, and proper to "be
introduced, &c., together with that of *Anne*."

The note for money won at play, in *Thomas vs. Watson*,
is declared, in most explicit terms, to be "*void by law.*"
Believing this to be true, of course we cannot adopt the view
of the appellee, that the single bill in this case, if given for
money claimed to be won at cards, was not *void*, but only
*voidable*.

But admitting the single bill to be void as between the com-
plainant and Sollers, still it is contended, by the appellee, that
a court of equity will not grant the relief sought, by restraining
an innocent *bona fide* assignee, for value, without notice of
the gambling transaction, from enforcing his claim under the
judgment.

In *Boyer vs. Bampton*, 2 *Strange*, 1155, it was decided,
that an indorsee of promissory notes given for a gaming trans-
action could not recover upon them, although he had no
knowledge that they were for money lent for the purpose of
gaming.

In *Lowe vs. Waller*, 2 *Doug.*; 744, the question was, whether an innocent indorsee of a bill of exchange, given upon an usurious consideration, could maintain a suit upon it. After having considered the case attentively, and with strong leaning in favor of the plaintiffs, Lord Mansfield decided against them. He says: "But the words of the act are too strong. Besides, we cannot get over the case on the statute against gaming, which stands on the same ground. This is one of those instances in which private must give way to public convenience."

The two cases just mentioned, as likewise *Woodson & Royster, vs. Barret & Co.*, and *Skipwith vs. Strother, et al.*, proceed upon the principle, that the security sued upon in each case was absolutely void in its creation, and could not be made valid by a subsequent transfer of it, even to a party having no knowledge of the defective consideration. In the two cases last mentioned there were judgments at law, in neither of which was any defence made because the claim was for gaming, and in each the claimant was an innocent assignee. Nevertheless a court of equity prohibited the assignee from enforcing the claim.

In *Woodson & Royster, vs. Barrett & Co.*, Judge Tucker, in very strong terms, denies that want of notice of a bond or other security being given for money won at gaming, will entitle the assignee without notice to recover in an action upon the bond or security. And he very correctly says: "A contrary decision would be tantamount to a declaration, that the statute against gaming was of no force or obligation whatever." He also says, what is certainly true: "The *circulation* of gaming bonds is an evil no less to be discountenanced than the *giving* of them. And no means are more likely to prevent the *giving* of them than to put an effectual stop to their *circulation*."

Much has been said of the great hardship which will be imposed upon an innocent assignee, if the principle contended for by the appellant is adopted; but although it may be true that such hardship will be the consequence, still the opposite theory will be instrumental in putting an end to what has been considered a wholesome restraint upon gaming contracts, and

thus inflict a public calamity for the purpose of removing a private inconvenience.

But suppose it will impose a hardship on an assignee, it is but a hardship similar to that which a party is subjected to, who takes an assignment upon an obligation given by an infant or a *feme covert*. In either case it would be considered strange law, to hold that the assignee would be entitled to recover upon such an obligation, because he had no knowledge of the infancy or of the coverture.

The bill charges, "that the only consideration of the said single bill is money which the said Augustus R. Sollers claims, or pretends to have been won, in betting and gambling at cards" with the complainant. That he "has been since the transaction so perfectly satisfied, and still is so, from his recollection of the facts, that although the said Augustus R. Sollers claims to have won the amount of said single bill, he did not win, but that the complainant was the winner, he feels, in justice to himself, compelled to avail himself in this case of the statutes and laws against gambling in order to defeat this unjust claim, a position he declares he would not take except under such or similar circumstances as those which surround this case."

The appellee considers this averment as tantamount to saying the single bill was not given for a gambling consideration, but entirely without consideration. And therefore it does not come within the operation of laws which make void a security given for money won at cards, but it is a mere *nudum pactum*, from which, after a judgment thereon, the party can claim no relief in a court of equity. But the bill certainly alleges, the consideration for which the security was given was money claimed by Sollers to be won by him. It was given and received, according to the understanding of the parties at the time, for a gambling consideration, and as such was void. It was not until after the transaction the complainant became satisfied that instead of being the loser he was the winner. When, therefore, the instrument was executed, it was intended by the obligor to secure the payment of money claimed to have been won of him by the obligee, who took and held the security for that purpose. Under those circumstances the single bill

Gough *vs.* Pratt, Adm'r of Kent.

was void when given. If afterwards the obligor became convinced he did not lose the money claimed of him, such subsequent discovery of his mistake could not render less vicious or less obnoxious to the laws against gaming, an obligation which, at the time of its execution, was understood and designed by both parties to be a security for a gambling claim, and which, as such, was subsequently held by the obligee.

The views presented in this opinion, we deem sufficient to show that the decree below should be reversed, for which purpose a decree will be signed, and the cause remanded for further proceedings. The costs to await the final result.

*Decree reversed and cause remanded.*

Note by the Reporter—The following is the opinion of *Chief Justice Taney*, in the case of *Thomas, Trustee of Lloyd, vs. Watson*, referred to in argument and in the opinion of the court in the preceding case:

"The court have taken time to examine this case with care, because the points raised in it are important, and some of them do not appear to have been fully settled by judicial decisions.

"The case, as it comes before the court, is this: Murray Lloyd, named in the proceedings, gave two promissory notes to Watson, the defendant, upon which a suit was afterwards instituted in this court, and judgment confessed by Lloyd on the 18th of April 1844, with an agreement entered on the record, that no execution should issue on the judgment, provided the amount was paid by the defendant in four equal annual instalments, counting from the day of entering the judgment, and in case of default in any instalment, execution to go for the whole sum then due. On the 15th of August 1845, Lloyd petitioned for the benefit of the insolvent laws of Maryland, and the complainant in this case was duly appointed his permanent trustee for the benefit of his creditors. Default having been made by Lloyd in the payment of the instalments hereinbefore mentioned, Watson issued an execution for the amount due on the judgment, which was levied on lands held by Lloyd at the date of the said judgment. And thereupon, on the 18th of December 1845, the complainant, as trustee, filed this bill before the district judge, and obtained the injunction now in question. Since the injunction issued the answer of the defendant has come in, and upon the facts stated in the answer it is unnecessary to examine any of the allegations in the bill upon which the injunction was granted, except those which relate to the consideration of the two notes given by Lloyd to Watson, and upon which the judgment in question was confessed.

"The bill charges that one of the notes was given upon an usurious, and the other upon a gambling, consideration; and offers to pay the amount actually loaned by the defendant to Lloyd, with legal interest thereon, and prays to be relieved from the residue of the judgment, and calls on the respondent to state what was the consideration for which the said notes were given. To this interrogatory the defendant has demurred, setting forth as his cause of demurrer that the consideration of the said notes was triable and determinable in the suit at law, and ought not therefore to be inquired into by this court, sitting as a court of chancery. The complainant excepts to this answer as insufficient, insisting that the defendant is bound to answer the interrogatory as above mentioned, and the case now comes on, upon the hearing of the exceptions, and upon the motion to continue the injunction.

Gough *vs.* Pratt, Adm'r of Kent.

Several points have been raised in the argument, which will be noticed hereafter, but the main question in the case is upon the effect of the judgment confessed in the action at law. The complainant, as trustee under the insolvent law, stands in the place of Lloyd; and undoubtedly the latter might in the suit against him have availed himself of the defences stated in the bill, and might have barred the action of Watson, by pleading the matters now insisted on. As he failed to do so, he would not in ordinary cases be permitted to insist on them in a court of equity, after having neglected to rely on them in the suit at law. But it does not follow that the same rule is to be applied, when contracts are made or securities taken in violation of law, or contrary to its declared and established policy. And of this description are all securities by note or otherwise intended to secure usurious interest, or for money won at play. In such cases the courts are called upon to consider, not only the laches of the party who may have been grossly negligent in asserting his rights, but must look also to the conduct of the adverse party, and determine whether it is consistent with sound principles of jurisprudence to protect him in the enjoyment of profits derived from securities taken in violation of the express provisions of a statute, and which the law declares shall be void. Undoubtedly it is within the legitimate province of courts of justice, and it is their duty, in the exercise of the powers confided to them, to carry into full effect the policy of the law when that policy is sufficiently and clearly manifested. Nor can they suffer it to be defeated or embarrassed, by the application of rules which do not belong to cases of that description, but are appropriate to another class of cases, and which have been adopted in them for the purpose of preventing unnecessary litigation; where nothing more is concerned in the issue than the individual rights of the contending parties. The distinction between these two classes of cases, and the different rules which govern them, has been frequently recognised where a party by his voluntary act has put it out of his power to use a legal defence, which would have protected him from the payment of the claim. Thus in ordinary cases of contract if a party pays money with a full knowledge of the facts, but under the mistaken belief that he is bound by law to pay it, and afterwards discovers his error, he cannot recover it back again by any proceeding in law or in equity. Yet in a case of usury or gaming, although he pays it not only with a knowledge of the facts, but with a knowledge of the law also, equity will relieve him and compel the adverse party to refund the money. As respects usurious interest paid to the lender, the amount paid over and above the legal interest may be recovered back again, either by a suit at law or a bill in equity. 1 *Fonb. Eq., B.* 1, *ch.* 4, *sec.* 7, *note k.* And as regards a security for money lost by gaming, it was indeed said by Ld. Talbott that it could not be recovered, both parties being equally in fault. But that point did not arise in the case before him and was an *obiter dictum,* when deciding upon a question of usury; and the point was decided otherwise in the case of *Rawden vs. Shadwell; Amb.;* 269. In the last mentioned case a bond had been given for money lost at play, and part of the money paid upon the bond, yet the court, upon a bill filed for that purpose, decreed that the bond should be delivered up to be cancelled and the money repaid. Indeed there can be no sound reason for distinguishing securities for money won at play, from securities founded in usury, so as to give any advantages to the former over the latter; for they are both prohibited by law, both contrary to its settled policy. And while the laws against usury are intended to protect the necessitous, against the oppression of the money lender; and against hard and ruinous contracts, forced upon them by their wants; the laws against gaming are founded upon a policy equally sound and clear, and are intended to discountenance and discourage a vice injurious to society, and often most ruinous to the individual. If therefore the money had been paid by Lloyd upon these two notes, it is evident the complainant might by a bill filed have recovered it back: and if the court of chancery would have interfered after the money had been actually paid, is there any principle of equity which will prevent it from interposing where the party has omitted to defend himself at law, and confessed a judgment? There is nothing certainly in the technical character of a judgment that will prevent the interposition of a court of

equity, for it is one of its ordinary functions to relieve against judgments at law, where a proper case is made out in equity. And if it will lend its aid to a party after he has acknowledged the justice of a debt, by the payment of the money, there can be no sufficient reason for refusing to interpose where the party has omitted to make the defence in an action at law, and acknowledged the debt by confessing the judgment. In either case the court acts to prevent the party from retaining an advantage which he has obtained under a contract forbidden by law, and to uphold an established public policy intended in the one case to guard against oppression, and in the other to suppress a vice injurious to society. And if the mere confession of a judgment at law would secure a party in his ill-gotten gains, the statutes passed upon these subjects would be nugatory, since they could be constantly and easily evaded by substituting a confession of judgment in the place of a note or bond, or other security. When the public policy established by the legislature is so obvious, and is so clearly founded in the principles of justice, and required by the interests of society, it would ill become a court of equity, by narrow and technical constructions, to deprive itself of the power of enforcing it.

"These principles are supported by high judicial authority. So far as the question of usury is concerned, the precise point before us appears to have been decided in the Court of Appeals of Maryland upon full argument, in the case of *West vs. Beans & Oden*, 3 *Harr. & John.*, 568, and also in 5 *John. Ch. Rep.*, 142, *Fanning vs. Dunham*. It is true that in the last mentioned case a warrant of attorney to confess the judgment was executed at the same time with the bond, and might perhaps be regarded as one of the securities taken by the lender. But the case evidently was not decided merely on that (point) ground, but was likened by the court to the case of a borrower, who had voluntarily paid the money, and therefore put it out of his power to resist, as defendant, the claim of the creditor. And as regards the money won at play, it is truly said in 1 *Story's Eq.*, sec. 303, that there is no difference in principle between usurious and gaming contracts in this respect, as the securities in both cases are void by law, and the contracts in each case against its policy. We concur in these doctrines, and think the omission of Lloyd to defend himself in the action at law, is no bar to the relief asked for by the complainant.

"If the question of usury or not, or of gaming or not, had been made in the suit at law and decided against Lloyd, undoubtedly the complainant could not be permitted to try the same question over again in equity, and consequently would not be entitled to the discovery he asks for. But these questions were not raised in that suit, and have not yet been decided in any court. The question before us is, whether it is too late now to raise them, and whether the judgment confessed shuts the door against further inquiry into the consideration of the notes upon which it is admitted to have been entered? We think it does not; and that the principle upon which the court grants relief after the voluntary payment of the money, must also entitle the party to relief after a voluntary confession of judgment. In each case the party, by his voluntary act, has deprived himself of the opportunity of defending himself in a court of law.

"The act of the General Assembly of Maryland, passed at December session 1845, after these contracts were made, and indeed after the bill in this case was filed, cannot, of course, have any influence in this decision. And if it could, it would not materially affect the principles hereinbefore stated. For although this abrogates the penalties inflicted by the act of 1704 in cases of usury, and permits the party to recover the sum actually loaned, with legal interest thereon, yet the contract, so far as the usurious interest is concerned, is still made void, and the policy of the former law upon the subject in that respect remains unaltered.

"It has, moreover, been insisted on in the argument for defendant, that the complainant is not entitled to the discovery, because the answer may subject the defendant to a penalty or forfeiture. Upon this point it is sufficient to say, that the defendant has not objected to answering on this ground; and does not aver in his answer that the discovery sought for would bring him into any such danger. It cannot therefore, we think, be relied on in the

argument. But if this defence had been made in the answer it could hardly have been sustained; for as relates to the usury, it is admitted by the bill, that no usury was received by the defendant, and the mere making of an usurious agreement, or taking a bond or other obligation to secure it, does not subject the lender to a penalty or forfeiture, nor do we perceive how he will be brought into any such danger by answering that part of the interrogatory which concerns the note alleged to have been given for a gaming debt. If he admits that the note was given for money won at play, it is difficult to imagine how that fact could be used to prove that he kept a *faro bank*, or practised any other of those devices upon which the law inflicts a punishment; nor can we imagine how this fact could become a material link in any chain of evidence in a prosecution against him. He is not asked to state the circumstances under which the money was won, he is required simply to say whether the consideration was a gaming debt or not, and there are a multitude of ways in which he may have won the money, without subjecting himself to a penalty. In a defence of this kind the bare statement of the defendant would hardly be sufficient, even if made in his answer, and the court must be satisfied that he has some reasonable and probable grounds to apprehend danger from his answer, in case a prosecution should afterwards be instituted against him. The right to a discovery, so far as it can be maintained on principles of equity, would seem to be peculiarly necessary and appropriate in cases of this kind, where the winner most commonly takes the security in private, when no witnesses are present who know anything of the transaction, and does this in order to deprive the loser of proof, if he should afterwards endeavor to resist the payment.

"No doubt an affirmative answer in this case will prevent the party from recovering the money. But that is not a penalty or forfeiture within the meaning of the law, and the object of every bill of discovery is to obtain from the defendant, the admission of some fact which the complainant supposes will enable him to prevent the recovery of some claim which the defendant has made against him, or enable him to enforce a claim against the defendant, which he hath not otherwise sufficient testimony to establish.

"It has been further argued, that as Lloyd himself has not made this defence, nor united in this proceeding, his trustee under the insolvent law has no right to bring these claims into question. But we regard it as settled law, that the permanent trustee, appointed upon the release of the insolvent, becomes immediately invested with all the rights at law or in equity which the latter then possessed, and may enforce any right, or make any defence which the insolvent could have maintained or enforced at the time of his insolvency. These rights are transferred to the trustee, and the complainant may now make the same defence at law or in equity against these claims, and against the judgment upon them, which Lloyd could have made if he had never become insolvent.

"The 1st and 2nd exceptions filed by the complainant must therefore be allowed, and the answer of the defendant in those respects adjudged insufficient, and the injunction heretofore granted be continued until the further order of this court."